Good morning. May it please the Court, I'm Peter Magaw and I'm here on behalf of the City of Healdsburg. As a preliminary matter, we've been provided with a request to submit additional authorities this morning. I don't know what the Court's view is on how we handle that before or after the clock starts running, but I did want to advise the Court that we are opposed to the suggested submission of additional authorities. This is a copy of an NPDES permit that was issued by the Regional Water Quality Control Board issued to the City of Healdsburg after the decision in the trial court was issued in this case, and as a result of that decision. I'm not entirely sure what the purpose of submission of this is. It's clearly not in the record. I would like to reserve five minutes for rebuttal with the Court's permission. This case presents three issues to the Court. It's our view that a decision on either of the first two issues is dispositive and the Court does not need to reach the third issue, which is the more difficult, challenging issue of adjacency. We believe the two issues that resolve this case simply and cleanly from the Court's perspective are One, does the excavation operation exception to the Clean Water Act definition I'm sorry, the definition of waters of the U.S. in the core regulations, does that exception encompass the basalt pond so that the basalt pond does not qualify as a water of the United States for Clean Water Act purposes? The second issue is does the waste treatment exception in the regulations encompass the basalt pond, a man-made pond that has been used historically for receipt of treated wastewater, so that, again, the basalt pond is not a water of the U.S.? I'd like to first address the question of the gravel mining exception. This is where the Court of Engineers has said that pits resulting from the excavation in dry land for the purpose of obtaining fill, sand, and gravel are not considered waters of the U.S. unless and until the excavation operation is abandoned. Now, in this case, the trial court looked at that language and it drew a line between excavation and operation. And it reached the conclusion that an excavation is different and is 180 degrees opposed from a filling or a reclamation of a gravel pit. But then we have an excavation spill filled with sewage. It's not filled with sewage. It's filled with treated wastewater. And I think that's an important distinction because the wastewater here is treated to secondary levels, which is the level specified under the Clean Water Act for publicly owned treatment work. But the point here is what we have is that we have a gravel mining pit that has been used, it's been excavated, and it is undergoing ongoing reclamation. Now, the court said— So how long can it go on? If we just put one piece of equipment on the property, can we make it go on forever and you can get the exception? No, it's a question of the reclamation plan. And the reclamation that is occurring here is pursuant to a reclamation plan approved by the Sonoma County Resources Agency. It's subject to Sonoma County jurisdiction and it's subject to regional water board jurisdiction. So this is not an unregulated, goes on forever type of situation. There is an end in sight. But the point being—and for that, even the court has said that they don't generally assert jurisdiction until the reclamation operation is either complete or has been ceased for a period of 10 years. We clearly don't have either of those two circumstances here. There's been no abandonment of the property by sire. The reclamation operation is ongoing, and there was no dispute about that. That was absolutely an undisputed fact at the trial court level. Where the trial court got twisted up was in this distinction between excavation as opposed to excavation operation. And the information the court didn't have, which was unfortunate, was it didn't have the guidance of the Corps' two statements in the Federal Register from 1999 and 2000 where the Corps has specifically said that they consider reclamation to be part of the ongoing gravel mining operation. Is that cell phone off? I'm sorry. What happened here is the court reached a conclusion which is diametrically opposed to the conclusion the Corps of Engineers have themselves placed upon their own regulation. And this court has to review that determination. It's a matter of law, so this court has a de novo standard to apply. This court has to look at the information available to it, and the Corps' interpretation of its own regulation is entitled to the highest level of deference afforded by this court. In fact, that was this court's statement in the Leslie Salt decision from 1997, is that the Corps' interpretation of its own regulation is entitled to the highest level of deference. So here the court has said not once but twice in the Federal Register that the Corps believes that ongoing reclamation operations are part and parcel of their view of what they meant when they said we don't assert jurisdiction over excavation operations. The trial court just missed it. It's unfortunate, but he made an erroneous decision. It's clearly subject to reversal by this court. This is an ongoing gravel mining excavation operation. It is not a water of the U.S. Second, I'd like to talk about the waste treatment system exception. And here again, the regulations specifically say that we at EPA will not assert Clean Water Act jurisdiction over the internal operations of a waste treatment system. We don't consider the internal components of a waste treatment system to be waters of the U.S. We will look at the end result of that process, but we won't look at the internal process of the system. But are the facts in those where they've got groundwater that goes into the Russian River and also they've got wetlands in between and it's very close and there's a dike and the whole thing, it seems to me that they're talking about waste treatment facilities that are in and of themselves are not feeding into a river. Well, I mean, the River Watch did raise that point in their brief, and they talk about closed systems. But in fact, there is no such thing as a closed system. Water has to go someplace everywhere. And so every system has an outlet somewhere, whether it's an evaporation or a percolation. What is clear from the EPA regulations is that they consider percolation ponds themselves to be part of a zero-discharge system. What EPA is talking about when they talk about discharges is point source discharges directly to a navigable waterway. And a point source here is a discrete or combined conveyance. It's a pipe. It's a channel. The one place there might ultimately be a point source discharge out of this waste treatment system known as the facility and including the pond is if Sire in the future builds a weir. And there was some testimony that they're thinking about building a weir across the levee so that they have a reinforced point at which the river could flood the pond in the future. Well, I had a question I don't want to forget. I think it was in your reply brief you mentioned in a footnote something about that if the court, that you wanted the court to say that the point source would be at the pond and not at the river. And that, did you say something like that? I think what we said was that if there is a point source, it would be at the point where that weir would discharge into the river rather than at the point where a pipe goes into this final element of the waste treatment system. Now, it seemed to me that something like that, if you have to get this permit, and apparently there's something out there that you did in fact get the permit, how would a court decide where that should be? Well, the question is... That seems to me that would strictly be within the experts that are out there knowing what's going on. But the decision for this court is whether this excavation is a water of the U.S. or not. Well, right, you have the excavation, you have the sewage exception, and then if you lose on those, then we've got to address the issues of the navigable waters. Right, we like to call it a waste treatment exception, but yes, you do have that exception. But the question here is, if you have a waste treatment system including a percolation pond, and EPA is very clear that percolation ponds are part of a waste treatment system, the question then is, from a regulatory standpoint, where do you regulate within that system? And what the court's ruling dictates is that the regulatory point, the point at which you have to meet Clean Water Act standards, is at an internal point within that treatment process. It's at the point after the primary clarifier, after the disinfection, after it travels through the pipe, but before it actually reaches its final treatment solution, which is this percolation pond. And the evidence was very clear that that was part of the designer's original intent for this waste treatment plant was to use these ponds as waste treatment. The court found that. Again, that was not disputed. But the pond, what happens to the water in the pond? The water in the pond percolates out of the pond just as in any other percolation pond. It goes out radially in all directions. It commingles with the groundwater, and it ultimately flows as part of the general groundwater flow towards the river. And there's no question. Ultimately... What are the distances we're talking about? The pond is approximately 4... The nearest edge of the pond is approximately 400 feet from the river. That may change if the river rises, and it may get closer. But in general, the pond is about 400 feet from the river. Wasn't there something in the record that was 50 feet at some point? It's 50 feet if the water's achieved flood stage, and it's about to go over the width of the roadway, and the roadway's about 50 feet. And so it could get up as close as 50 feet from one side of the road to the other before it spills over and flows into the pond. But that's a very unusual circumstance. That's not the normal circumstance out there at this particular site. Is there anything in their answer to your argument that you want to talk about now, or do you want to wait for rebuttal? I mentioned the zero-discharge issue, so I think it's important that the court recognize that. I don't think there was anything in particular that I wanted to address in response to that, but I do want to reinforce, again, the court's finding that it was the intent of the designer to incorporate these ponds into the system. Again, the court got hung up on this language within the waste treatment system exception that says waste treatment systems including ponds and lagoons designed to comply with the Clean Water Act. And I think the history of that particular regulation clearly demonstrates that it's intended to be an inclusive description, not an exclusive description. And what the court did was it looked at that and said, including ponds and lagoons designed to comply with the Clean Water Act are the only ponds and lagoons that can fall within this exception now. And that's not what EPA intended. I come from Arizona, and there's a big difference between waste treatment plants in Arizona and one that's in the middle of wetlands. And I gather this is that the water is saturated around the pond? The land is saturated with water? This is part of a large aquifer. And frankly, even in Arizona, the ponds that you discharge to in Arizona percolate down and ultimately reach the aquifer and will eventually reach groundwater resources and surface water resources. So it's ultimately not different. It's a question of scale, but not necessarily the difference in magnitude, but not in time. But there are certainly some differences. But nonetheless, it's a waste treatment system. So the question is, it's important to recognize this pond was not a water of the U.S. at the time it was incorporated into the system. The court specifically found it was not a water of the U.S. as late as 1986. This pond came into use and was incorporated into the system in 1978. In 1983, Healdsburg got a Clean Water Act grant from the federal government to upgrade its outfall into this pond. At that point, the federal government clearly recognized this pond was part of the waste treatment system. It was not a water of the U.S. at that time. So the question is, can a piece of a waste treatment system lose its character because of things that happen after it's been incorporated into the system? So your position would be it never could lose its feature. That's right. Once it's part of the waste treatment system, unless there's some dramatic act that we haven't considered, it is part of the waste treatment system. And the fact that wetlands grow up around it, the fact that it's undergoing reclamation and it's becoming better doesn't change its character as part of the waste treatment system. If it impacts the river, that's a separate question. But there's no evidence, again, that this one impacted the river, and the question is not so much does it impact the river. The question that I'm talking about right now is, is the pond itself a water of the U.S.? I mean, we all know the river's a water of the U.S. There's no dispute about that. But does the pond itself somehow lose its character? I guess we probably ought to talk a little bit about the adjacency issue because that is obviously what's got the courtroom filled today, and that's what everyone's interested in. We can't ignore Baccarat. Baccarat just came down from this court, and it obviously reaches some conclusions, but there's some very significant differences between this case and the Baccarat case. First of all, we have a larger distance between the waters and the wetlands involved in our case and those in the Baccarat case. Baccarat was somewhere between 60 to 70 feet and some descriptions of 250 feet, but it's unclear. Here we've got 400 feet. Second, in Baccarat, they were looking at a jurisdictional determination by the Corps that found jurisdiction. Here we have a jurisdictional determination by the Corps that declined jurisdiction. Well, that is, there seems to be, that's a little bit, you know, I would very rarely, you know, obviously there's Chevron deference, and I would very rarely go against that. But in a situation where you have evidence in the record that this individual didn't do any investigation, relates a relationship with one of the parties, and, you know, an admitted bias, isn't that precisely the type of situation where you wouldn't give deference? Well, I think it's important to recognize, first of all, a couple of things. There was investigation. I mean, Mr. Straub, who was the lowest-level employee in the Corps involved in this, did conduct an investigation. He was familiar with the site from previous visits. He solicited information from Sire, the owner of the site, about their ongoing reclamation activity. Those facts were never in dispute. The fact that Sire was engaged in ongoing reclamation activity was not disputed. So Mr. Straub had in his hands the facts he needed to make that decision. His letter reflected those facts, and, in fact, his letter reflects exactly the interpretation that the Corps places on its own regulations, the interpretation that says that ongoing reclamation activity exempts these waters from designation as waters of the U.S., that the Corps does not assert jurisdiction. So there was nothing wrong with Mr. Straub's analysis. I think where the Court made the mistake here was, first of all, in applying an incorrect standard of deference to the Corps' determination. Here, the trial court used a power-to-persuade standard from the Christensen case. In fact, this was a jurisdictional determination by the Corps of Engineers. It was subject to review under the provisions of the Administrative Procedures Act, and, as the Court again stated in Baccarat just recently, that is a much higher standard of review than the trial court gave to the Corps' letter in this case. So we're talking arbitrary and capricious. Absolutely. The question is, is this opinion on its face arbitrary and capricious, recognizing that it started with Peter Straub, but it then worked up through Jane Hicks, it was reviewed by District Counsel John Eft, and it was approved finally and signed not by Peter Straub, but by Calvin Fong, the District Engineer. So this was not Peter Straub's opinion. This was Calvin Fong's approval of that opinion, and there were changes made to that letter during the review process. So this is not just one low-level staffer's point of view. This is, in fact, the point of view of the Corps. It is consistent with the Corps' own interpretation of its own regulations long before this issue arose. And this is not just a single Corps engineer going off on a tangent. This is consistent with the Corps' position as stated in the Federal Register. You may want to say something, do you? I'm sorry. Thank you. Thank you. Good morning, Your Honors. My name is Charlie Tibbitt. I'm an attorney with the Western Environmental Law Center representing Northern California River Watch in this case. I want to cover three particular issues today. The first is the waters of the United States, the second is the excavation exemption, and the third is the wastewater treatment exemption. First, the waters of the United States. There are six grounds upon which the Court can affirm the District Court ruling, any one of which makes Northern California River Watch the prevailing party. So what about this letter? The letter? Since it is arbitrary and capricious as the standard, why is it arbitrary and capricious? Going right to the deference issue, this letter is not entitled to Chevron deference. This letter is entitled to Mead deference only, Mead and Skidmore type deference only. But the Court went through those factors very specifically, and it found that the validity of that letter was undermined by a number of different issues. There are four factors to deal with in Mead, and they are the agency's care, the relative expertness, the persuasiveness of the position, and the consistency with earlier, later pronouncements. And the Court, and this is in the record at record 10, and it goes pages 24 through 25, discusses this in detail. There were witnesses presented. Mr. Straub was a witness. Another one of the Corps of Engineers people was a witness. And the Court specifically found that there was no agency care. Mr. Straub never went out to the site after he got the letter. He relied on an investigation from some five years prior. He hadn't seen the change in circumstances. The relative expertness. The Court found that none of the four people that supposedly went up the chain, and I would say that the record is not very clear on this, and I would like to add that Mr. McGaugh, I believe, is playing a little fast and loose with the facts, as he did in his opening brief, which we pointed to with a very long citation at footnote 11 of our response brief. But in any case, the relative expertness. There was no expertness found by the Court for any of those four people as to their knowledge of how to delineate wetlands. Period. It's in the record. The third issue, the persuasiveness of the position. The Court found it was not persuasive at all for a number of reasons. In the same consistency with earlier and later pronouncements, the Court found that it was not consistent. What was in the record about bias? That is an additional issue. The Court found that Mr. Straub was a personal friend of the SIAR Industries people. And in fact, if you look at the record, Mr. Straub, after receiving the letter from Northern California River Watch, sent an email to SIAR saying, here are my questions. And in response, counsel for SIAR wrote a response back. And guess what came out in Mr. Straub's letter? Pretty much a regurgitation of what SIAR said. And that information, the Court went through in detail. The Court heard the witnesses. The Court heard the different people talk about this and found that Mr. Straub's letter, which is really the whole basis here. Mr. Straub is the only one that did any, and I wouldn't even call it investigation, but any attempt to build the record, if you will. Tell me, what is his position again? He found that... Straub, who is he? Oh, he was a field person for the Army Corps of Engineers. Well, and he concluded that they were not going to exercise jurisdiction, meaning that it wasn't navigable waters, right? Because there was so-called ongoing excavation going on. But if you look at the issue of excavation and excavation operation, Mr. McGaugh tries to conflate the two words. In fact, excavation operation applies to obtaining sand and gravel. There's no sand and gravel here that was being obtained. There's wastewater being discharged into it. And I think the Court needs to step back for just a moment, if you will, and look at that. The excavation exemption only applies to SCI-R. SCI-R is not before this Court today. The excavation exemption does not apply and goes out the window when a municipal sewage treatment system is discharging into a pond. There's nothing in the regulations about excavation exemptions for sand and gravel mines that say, but it's okay to discharge sewage from a municipal sewage treatment plant. That exemption doesn't apply at all. If it applied to anyone, it applied to SCI-R. It certainly doesn't apply to Healdsburg here in this case. Okay, what is the relevance of this document? When you're referring to this document, ma'am? Discharge requirements for the city of Healdsburg. The supplemental authority that was submitted today? Yeah, supplemental authority, yeah. There are findings of the agency, detailed findings of the agency, factual findings and conclusions that this is also an NPDES permit, which is the relief sought by Healdsburg in this case. And so this is a continuing part of the case. The Court ordered that Healdsburg get an NPDES permit. And what you have before you is that permit. Is it the permit for this? It's a permit for what? It's a permit for the discharge of the city of Healdsburg now into Basalt Pond. So it's a permit on this case? Yes, it is. And this is the relief that was ordered by the judge. Right. And there was going to be additional penalties every day that they didn't have the permit, right? Right. This permit was just issued about a month ago. I see. That's why it's brought to the Court's attention now. It was raised and it was issued as a result of the district court's decision. Right. And it's a very lengthy permit. It has very specific conditions, far more specific than the agency had given. Well, are you trying to bootstrap that from the standpoint that the fact that they issued a permit means that the source point ruling is correct? No, Your Honor. We're just asking you to take judicial notice of another agency's determination. That's all. And you can give it the weight that you wish. It's also, as I said, it's part of the ongoing case and part of the... Well, is one inference from that that they wouldn't issue a permit if it wasn't a source point? Well, there's certainly that, yes. But, again, you can give it the weight you wish. Or point source, I guess. Yeah. We're perfectly comfortable with all the arguments in our briefs, even without this permit being there. But this is additional information that the court should have before it. Would the court like to discuss the waste treatment exemption first or the Waters of the United States question? You decide. All right. Well, I'd like to go with the Waters of the United States question because I think that is the real issue here today. And there are six reasons, and I'll list them very quickly. Adjacent water body, adjacent wetlands, hydrological connection, ecological connection, tributary, and point source. How is that affected by this case heading for the Supreme Court? It's not at all, Your Honor, because this case is much more squarely in Riverside Bayview than Carabel or Rapanos. Both Carabel and Rapanos dealt with wetlands that were miles from any navigable, in fact, water. It was not a situation where there was an adjacent water body or an adjacent wetland to a navigable, in fact, river. So I don't believe this court needs to worry about what the court is going to do in Rapanos and Carabel because it will not be relevant. Riverside Bayview was a 9-0 decision. It was upheld in Swank, even in a 5-4 decision there. I have concerns about the district court, as I understand it, that once you get rid of the exclusions, then the district court said that basically it's adjacent, it's a point source, and then said a tributary as well. I have concerns about the tributary in the sense that, now, there isn't anything out there where groundwaters have ever been a tributary before, correct? So that argument goes where no one has ever gone, correct? Well, it's not... Just tell me, you don't have to have that to win. Right, exactly, and that was going to be my point. You don't have to find that the groundwater is a tributary under the Clean Water Act, therefore waters of the United States. The groundwater acts as a conduit for pollution, and Congress intended to stop pollution at its source. It said, let's go to the source and stop that. It doesn't matter where it's going. If it's going into a water that's hydrologically connected, i.e. a conduit, to a surface water, a navigable and fact water, you're in the door. And that's actually the issue I wish to address today, and I hope the court addresses this issue because I think this is very important, and that is hydrologically connected waters are waters of the United States. That issue has never been addressed by this circuit directly. Another circuit has. Other district courts have. District courts within this circuit have addressed this question and come up with varying opinions, although the majority is that hydrologically connected waters are waters of the United States. As Judge Windmill said in IRC v. Bosma, whether pollution is introduced by a visible above-ground... Pardon me? Did somebody say something? Excuse me. Whether pollution is introduced by a visible above-ground conduit... Excuse me, is there... You know what's wrong? I think what's wrong is that you're close to the mic. You're picking it up and we're getting a... You're getting a readback. So it's you that you're hearing. Again, it's an above-ground... Whether the pollution goes by above-ground conduit or enters the surface water through the aquifer matters little to the fish, waterfowl, and recreational users which are affected by the degradation of our nation's rivers and streams. And that's the salient point. And I believe this court essentially made that same determination in Headwaters v. Talon Irrigation District. But at some point before you sit down, I wish you'd tell us what you think the bottom line of this court's decision should be. It'll help when he comes to rebut. Right. The bottom line is... You have to hit it now. I'll be happy to, Your Honor. I do think that this is a straightforward issue. That the discharge of pollutants into the nation's waters must be stopped. And that's what Congress intended. And that's what we have here. And Mr. McGaugh, I believe, in his opening argument, said there's no impact on the Russian River. The court found otherwise. Very clearly the court found otherwise. And that's what we have here. We have a situation where hydrologically connected waters, the Russian River, navigable, in fact, river, is being affected by pollution. And that's why I think this court needs to address this issue head-on. So if you want, just to help me as a desert dweller, distinguish this pond and the pond that may be discharged in a sewage treatment plant in the desert that's percolating down to an aquifer. Well, in that situation, the pond would be designed such that pollution does not reach the groundwater. That's not at all what happened here. The pond would be designed to percolate, to filter out, to allow. Evaporation filters it out. Right. And in Arizona, a lot of it is actually evaporation. Yeah. And so between those two things, that the contaminants are reduced to the level that they don't cause a problem. Because Congress did intend to protect the nation's groundwaters as well in the Clean Water Act. But could that pond be hydrologically connected? It can if there's no pollution coming from it, yes. Because that would be a determination that the agency would make. In this situation, the court found that pollution is actually reaching the navigable, in fact, river. And that is the issue that the majority of courts have found. If the pollution is reaching the surface water from a hydrologically connected water, then it's covered by the Clean Water Act. And virtually all the courts have either addressed that and found that to be the case, or the cases that go against that are in the minority have found there weren't facts presented enough to make a determination that the hydrologically connected water was impacting surface water. They didn't say it can never be covered. And, again, on the hydrological connection question, Congress sought to protect the physical, chemical, and biological integrity of our nation's waters. And that is the salient point which, Judge Ferris, I would like you to focus on and all of you, Your Honors. Here we have pollution reaching the Russian River. And, in fact, now we have Basalt Pond that has become waters of the United States. When it started out, it wasn't waters of the United States. But it has now been reclaimed to the point where it does meet the case-by-case determination that it is a water of the United States. Period. Because of its ecological connections with the river, its hydrological connections to the river, its impacts on the river. And that doesn't even get us to the issue of adjacent water body and adjacent wetlands. This Court, obviously, the Baccarat case is on all fours with this. This is an adjacent wetland. There are adjacent wetlands present. The bigger question is, what's an open body of water? An open body of water isn't defined and we don't have all these machinations in law about that. Because an open body of water, you know it when you see it. This is an open body of water. Would the this be? Basalt Pond. Basalt Pond is an open body of water. It happens to have wetlands in it also, which gives the Court additional reasons for jurisdiction. But the adjacent water body is enough. And, again, the reason the regs don't talk about adjacent water bodies is because wetlands are different. Where does a wetland start and when does it end is a much more difficult question than you look and you see a pond or a lake that's covered by the regulations. Well, what do you see as the narrowest ground in which this? We've got a lot of issues. We're floating around with a lot of issues here. No pun intended here. Well, what do you see as the narrowest issue in which this judgment could be affirmed? Well, I think the most important issue is the hydrologically connected one because that's what Congress meant to get at. It meant to stop pollution in our nation's waters. And we have pollution here in this situation. So it's flowing directly into the water? Well, there's a pipe that's going into Basalt Pond, and Basalt Pond is transmitting pollution to the Russian River by two means. Through the levee that's between the man-made levee, by the way, that's through the groundwater. So you have both means to make your determination. It's not just the groundwater. But the groundwater clearly is tributary to the Russian River. It adds water to the Russian River. So there are just so many grounds for this court to affirm the lower court decision. We hope you'll reach a number of them because they're all important and the facts are all very well presented in this case. Is there any other case where the groundwater is a tributary? Yes. IRC versus BASMA where the court found that if we proved that pollution from the surface water reached into groundwater, then reached another surface water, that that groundwater essentially would be tributary. Yes. Would the court like to hear anything about the wastewater treatment issue? Well, let me just briefly, I know I just have a couple minutes left. Wastewater treatment exemption doesn't apply because the Clean Water Act was not part of that discussion. Wastewater treatment exemption applies to ponds that are built as part of the Clean Water Act protections. That wasn't present here, period. We need to go no further. In addition, this pond was not built by CYAR to meet Clean Water Act, excuse me, Healdsburg to meet Clean Water Act standards. It's a hole in the ground through which water flows into the Russian River. It may just take one moment to see if I have missed anything. I think I covered it. Thank you. Thank you. Just very briefly on the additional authorities that were submitted. This is a post-trial piece of evidence. It's hearsay. But beyond that, this permit's on appeal. It was a direct result of this decision. It's okay. We'll just take it for what it's worth. Okay. All right. I want to address the letter first and very quickly. The court rejected the letter because it found it non-persuasive. The reason the trial court found the letter non-persuasive was because it The trial court said the Corps' letter is wrong because it equates those two things. Well, in fact, that's exactly what the Corps of Engineers does. And the court didn't know that. It didn't realize it. So the basis for the court rejecting this letter was it was concerned about Mr. Straub's relationship with CYAR. But first and foremost, the court didn't find the letter persuasive. But that's because the court got it wrong, not because the Corps got it wrong. In the state of finding the fact that there was no investigation done and that this person had a relationship, let's assume that those would be finding the facts, which the court could do. Yes. Then you have the letter. I mean, what would ever be arbitrary and capricious? Well, you have to look at the letter. And this letter recites the facts accurately. It says this pond is owned and operated by CYAR. It is subject to ongoing reclamation. Those facts are true. They're correct. They're indisputed. The letter then says this is the standard we apply. Ongoing reclamation is not deemed to be abandoned. So you look at the facts. You look at the law that the Corps applies. If those two things make sense, it's not arbitrary and it's not capricious. And so the derivation of the letter is unimportant at that point. It's inappropriate to go beyond the four corners of the letter, frankly. So in this case, if you look at the trial court's decision, the primary reason the trial court rejected this letter was because it found it unpersuasive. The reason it was unpersuasive is because it had a different conclusion than the court did, but the conclusion the Corps of Engineers reached was completely consistent with the Corps of Engineers' interpretation of its own regulations. So your argument is regarding the letter, so far as you can say. I think the letter is entitled to substantial deference by this court. What is its great strength? The strength of the letter is it's right. It accurately applies the Corps' interpretation of its own regulations, which is an interpretation which has to be applied by this court, unless it is just so far out there that it's wrong. I think what the chief is asking you, how does that say you win? The conclusions in the letter, what are the conclusions in the letter that say you win? The conclusions in the letter say that this is not a water of the U.S. because it has not been abandoned, and it's the question of abandonment that drives the Corps' decision. So the Corps says it's on the question of abandonment. I do want to make the point, however, you can't have two statuses of this water. Mr. Tibbets made the argument that the exception only applies to Syre. How can a water body be a water of the U.S. for Healdsburg, but not a water of the U.S. for Syre, or vice versa? I mean, there's no precedent in law to support different jurisdictional standards for a water body. Thank you. Thank you. Thank you very much. I spoke with a citation of the record. Very quickly. I spoke about the statement of facts, and my footnote in my brief, I think I stated as footnote 11. It's actually footnote 9. Thank you. The matter just argued is submitted for decision. That concludes the Court's calendar for this morning's Court's resolution.
judges: Schroeder, Farris, Callahan